559 F.2d 1227
 11 ERC 1258, 9 ERC 1611, 7 Envtl. L.
Rep. 20,101
 GREENE COUNTY PLANNING BOARD et al., Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent,
Power Authority of the State of New York and United
Brotherhood of Electrical Workers Local 1249, Intervenors.
 Nos. 500, 501, Dockets 76-4151, 76-4153.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 27, 1976.
Decided Dec. 8, 1976.
On Rehearing En Banc June 30, 1977.
 
 Robert J. Kafin, Glens Falls, N. Y., for petitioners, Greene County Planning Bd. and Town of Greenville.
 Barry H. Garfinkel, New York City (Douglas M. Kraus, New York City, on the brief), for petitioners, Town of Durham, and others.
 Robert J. Kafin, Glens Falls, N. Y., for petitioners Greene County Planning Bd. and Town of Greenville.
 Barry H. Garfinkel, New York City, for petitioners Town of Durham, et al.
 Philip R. Telleen, Washington, D. C. (Drexel D. Journey, Gen. Counsel, Robert W. Perdue, Deputy Gen. Counsel, Allan Abbot Tuttle, Solicitor, McNeill Watkins, II, and David P. Boergers, Attys., Federal Power Commission, Washington, D. C., on the brief), for respondent.
 
 
 1
 Thomas F. Moore, Jr., New Rochelle, N. Y. (Scott B. Lilly, John C. Mason, Vincent J. Tobin and Arthur J. Kalita, Attys., New York City, on the brief), for intervenor, Power Authority of the State of New York.
 
 
 2
 Jules L. Smith, Syracuse, N. Y. (Blitman & King, Bernard T. King, Syracuse, N. Y., on the brief), for intervenor, International Brotherhood of Electrical Workers Local Union 1249.
 
 
 3
 Ronald A. Zumbrun, Robert K. Best, Raymond M. Momboisse, Sacramento, Cal. (Albert Ferri, Jr., Glenn E. Davis, Lawrence P. Jones, Washington, D. C., of counsel), for amicus curiae Pacific Legal Foundation.
 
 
 4
 Before LUMBARD and VAN GRAAFEILAND, Circuit Judges, and BONSAL, District Judge.*
 
 LUMBARD, Circuit Judge:
 
 5
 These petitions for review under 16 U.S.C. § 825(b) of orders of the Federal Power Commission authorizing construction of an electrical transmission line by the Power Authority of the State of New York and declining to award attorneys' fees and other litigation expenses to various intervenors provide the fourth occasion for this court to review aspects of PASNY's efforts to construct a 35 mile power line through the scenic Durham Valley in Greene County.[1] The Commission issued its opinion and order on January 29, 1976, and on April 27, 1976 it denied a motion to reopen the record.
 
 
 6
 The Greene County Planning Board and the Town of Greenville (hereinafter "Greene County") assert that the Commission violated its duties under the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 et seq., and under the Federal Power Act, 16 U.S.C. §§ 791a et seq., by improperly limiting its analysis of benefits and adverse impacts rather than considering related, pending projects and broader systematic concerns and alternatives. Moreover, petitioners claim the Commission should have reopened the record to consider newly-available data on electricity consumption and other evidence tending to rebut its conclusion that the power line is necessary. They also make various complaints about the adequacy of the Commission's environmental impact statement and the fairness of the hearing conducted by the administrative law judge. We conclude that the Commission has fulfilled its obligations under NEPA and the FPA, and that none of petitioners' other claims warrant reversal.
 
 
 7
 The Town of Durham and the Association for the Preservation of Durham Valley, intervenors before the Commission who were successful in urging the selection of an alternative route for the power line, join with Greene County in asking us to reverse the Commission's refusal to pay for their litigation expenses. Since recent rulings by the Comptroller General indicate that the FPC has authority to grant these reimbursements in appropriate circumstances, we remand to the Commission for further consideration of this issue.
 
 I.
 
 8
 The history of this case dates back to August 1968 when the PASNY applied for approval from the FPC for construction of an 1100-megawatt pumped storage facility near Gilboa, New York. Under 16 U.S.C. § 797(e) the FPC has licensing jurisdiction over such a hydroelectric project and over any transmission lines that are designed for the primary purpose of serving the project. The plan for the Gilboa project was approved by the Commission in June 1969, and it envisaged three 345 kilovolt transmission lines, specifications for each of which would be subject to final review by the Commission. One line was to run southwest to Dehli, one northeast to New Scotland (near Albany), and one southeast for 35 miles to Leeds. Plans for these lines were soon submitted, and the Dehli and New Scotland lines were promptly approved without arousing significant opposition. Environmental controversy arose over the proposed Leeds line, however, and various opponents ultimately received permission from the Commission to intervene. After some reworking of the Leeds proposal by the PASNY, a hearing before Administrative Law Judge William C. Levy commenced on November 9, 1971.
 
 
 9
 The hearing continued until interrupted by order of this court on January 17, 1972. In Greene County Planning Board v. FPC (Greene County I), 455 F.2d 412 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972), we ruled that the FPC was violating NEPA by conducting hearings in reliance on the environmental report submitted by the PASNY, instead of first having prepared its own environmental impact statement. Id. at 422. The FPC staff was ordered to prepare its own impact statement to serve as a foundation for cross-examination of PASNY and FPC witnesses at the hearing. In Greene County I we also cautioned the Commission not to ignore broad but potentially relevant considerations such as future power demand and supply, alternative sources of power, and impending plans for further power facility construction.
 
 
 10
 After its petition for certiorari had been denied, the FPC set about the task of complying with this court's mandate by drafting an impact statement, soliciting comments, and preparing a final impact statement. The hearing then recommenced[2] and ran for two and a half months before the record was closed on October 27, 1973. Considerable expert engineering testimony on the need for the transmission line and testimony on its environmental impact was adduced from the PASNY employees charged with the planning and evaluating of the line and also from the employees of the FPC who had prepared the environmental impact statement. The Durham intervenors put on their own environmental experts to testify against the PASNY's preference for a route running through the Durham Valley, which is an especially scenic part of Greene County. The Greene County intervenors sought to call as their own expert witness an environmental engineer employed with the Office of Environmental Planning of the New York State Public Service Commission, but Judge Levy ruled that the state was not required to furnish such expert testimony. On July 1, 1974, Judge Levy issued his opinion authorizing construction of a Gilboa-Leeds line and selecting as environmentally least harmful a route that skirted the Durham Valley, twenty-nine months later the Commission affirmed.
 
 
 11
 The Commission's finding of need for the transmission line rested on substantial evidence that the line is necessary if the PASNY is to make optimal use of the Gilboa power storage facility. Engineering opinion was unanimous that the Gilboa-Leeds line would significantly improve the "reliability and stability" of power transmission from the Gilboa project, as well as increasing the "transfer capability" of the overall PASNY network. Thus, the line would ensure access to readily available and inexpensive Gilboa power at times of peak consumption in New York City and other parts of the state, and it would also increase the PASNY's capacity to meet localized peak demands by transferring power as needed to and from various points within eastern New York.
 
 
 12
 The Commission also decided that the 345 kv transmission line should be constructed with the capability of being expanded to two 345 kv lines or a 765 kv line if the need for the additional transmitting capacity were to arise in the future. The second 345 kv circuit would be most useful if a second hydroelectric storage project presently under PASNY and FPC consideration were to be constructed in the vicinity of Gilboa; upgrading the line to 765 kv would be called for if the PASNY decided to go forward with its plans to upgrade its overall network of lines with which the Gilboa-Leeds line connects; and the Commission concluded that convertibility of the 345 kv line would result in substantial environmental and construction cost savings if either of these likely contingencies were to develop.
 
 
 13
 The Commission rejected Greene County's motion that it reopen the record in order to consider recent data indicating that electricity consumption in New York City and the rest of the state has significantly and unexpectedly declined, and also that since its construction in 1973 the Gilboa facility has been able to function without mishap and at full capacity by using just the Gilboa-New Scotland and Gilboa-Dehli transmission lines. The Commission said that this new information would not require any modification of its order for the construction of the Gilboa-Leeds line.
 
 II.
 
 14
 The purposes of NEPA are frustrated when consideration of alternatives and collateral effects is unreasonably constricted. This can result if proposed agency actions are evaluated in artificial isolation from one another. Accordingly, an agency is required to consider the full implications of each decision in light of other potential developments in the area, and to prepare a comprehensive impact statement if several projects are significantly interdependent. Kleppe v. Sierra Club, 427 U.S. 390, 408, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576, 590 (1976); Chelsea Neighborhood Ass'n v. United States Postal Service, 516 F.2d 378, 388 (2d Cir. 1975); Natural Resources Defense Counsel v. Calloway, 524 F.2d 79, 87-90 (2d Cir. 1975). A balance must sometimes be struck between the importance of going forward with a project presently under consideration and the danger of improperly "piggybacking" several related projects by justifying each of them on the assumption that the others are to be constructed, only to discover later that the overall combination of the projects may do more harm than good.
 
 
 15
 With these principles in mind, we concur in the FPC's conclusion that the Gilboa-Leeds transmission line is an appropriate unit for an impact statement. On the basis of substantial evidence, the Commission found that the line is necessary in order for the state to make optimal use of the existing Gilboa storage facility. Since the line was justified on this ground alone, there was no need for the impact statement to encompass other present and future PASNY proposals for which the line would have additional utility. Of course, under NEPA as well as under the long-range planning requirements of the Federal Power Act, 16 U.S.C. § 803(a), the Commission still had an obligation to take these related contingencies into account as it did, for example, in providing for the possibility of a future doubling or upgrading of the initial 345 kv line but it was not compelled to postpone for years its decision on the Gilboa-Leeds line while waiting for all these related plans to become fixed.
 
 
 16
 Petitioners also criticize the FPC for failing to consider the special environmental impacts associated with 765 kv transmission. We agree with the Commission, however, that detailed analysis of this ancillary subject would not have been productive. In ordering that the 345 kv line be designed so as to be upgradable to 765 kv if necessary, the Commission did not pass on the ultimate merits of 765 kv circuitry; it simply took into account the reasonable possibility that such upgrading may be desirable at some future date. It appears that inclusion of this capability represents a relatively minor modification of the primary 345 kv structure, and that it in no sense compels future upgrading. Hence, provision for upgrading would seem to be appropriate regardless of what might be said at some future time about the adverse environmental effects of 745 kv transmission. Under these circumstances there was no necessity for extensive environmental analysis of 745 kv transmission in the present licensing proceedings.
 
 
 17
 Another contention of petitioners is that the FPC's consideration of alternative routes was inadequate. Although the impact statement discusses five routes from Gilboa to Leeds as well as the possibility of relying on existing rights-of-way for more circuitous routes to the north or the south, petitioners suggest that alternatives not involving Gilboa and Leeds termini should also have been considered. The record reveals, however, that a third 345 kv line is necessary for maximum reliability of transmission from Gilboa. It also seems clear that, given the existing PASNY network, having Leeds as the other terminus of this third line from Gilboa is the only way to ensure reliable power flow from Gilboa to both upstate New York or New York City. Since the need for an additional circuit from Gilboa to Leeds was thus established, we are satisfied that consideration of "systems alternatives" involving other termini was unnecessary.
 
 
 18
 Nor did the Commission abuse its discretion in refusing to reopen the record to consider new evidence. While an agency does have an obligation to make corrections when it has been relying on erroneous factual assumptions, especially where broad public interests are at stake, see Hudson River Fishermen's Ass'n v. FPC, 498 F.2d 827, 833 (2d Cir. 1974), an agency's refusal to reopen the record cannot be deemed arbitrary and capricious unless the new evidence offered, if true, would clearly mandate a change in result, see ICC v. Jersey, 322 U.S. 503, 514-15, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944). Although the decline in New York power consumption levels and the successful operation of the Gilboa facility without the Gilboa-Leeds line do tend to undercut the Commission's conclusion that the additional line is necessary for optimal reliability of power transmission from Gilboa, the undercutting is at best only partial. Consequently, we cannot quarrel with the reasonableness of the Commission's conclusion that neither of these new facts would affect its determination regarding the need for a Gilboa-Leeds line.
 
 
 19
 Petitioners assert that the record was also incomplete due to the improper exclusion of evidence by Judge Levy. They object specifically to two rulings: (1) the refusal to allow them to use a state employee as their own expert witness, and (2) the refusal to order the FPC to produce a potentially relevant staff report.
 
 
 20
 With respect to the first ruling, we do not agree with respondent's assertion that employees of applicants can never be subpoenaed to furnish expert testimony before the FPC. The Administrative Procedure Act, 5 U.S.C. § 555(d), provides that agency subpoenas shall issue "on a statement or showing of general relevance and reasonable scope of the evidence sought." The agency must determine what constitutes "reasonable scope" in each case. See, e. g., Independent Directory Corp. v. FTC, 188 F.2d 468, 470-71 (2d Cir. 1951). Although Virginia Petroleum Jobbers Ass'n v. FPC, 110 U.S.App.D.C. 339, 293 F.2d 527, 529 cert. denied, 368 U.S. 940, 82 S.Ct. 377, 7 L.Ed.2d 339 (1961), indicates that opponents of an application are not routinely entitled to free run of the applicant's experts, this does not mean that subpoenas of experts are never appropriate where, for example, the parties seeking the subpoena are unable to afford their own experts, the expert testimony sought would be highly relevant, and the employer-applicant is itself a government entity with a corresponding obligation to serve the broad public interest. Nonetheless, since substantial environmental evidence was already in the record and since the witness, Frank Brugraff, was expert only in the environmental effects of transmission lines, there is little reason to believe that his expert testimony would have affected the Commission's ultimate finding of need for the line. In light of this consideration, we cannot say that curtailment of Burgraff's examination was an abuse of discretion.
 
 
 21
 The document at issue in the second ruling was a 1969 internal agency report prepared by the FPC staff which concluded that the Gilboa-Leeds line would function for the primary purpose of serving the Gilboa hydroelectric facility and would therefore be subject to FPC jurisdiction under 16 U.S.C. § 797(e). Certainly, the standards for discovery in an administrative proceeding should not be more restrictive than the standards for disclosure under the Freedom of Information Act, 5 U.S.C. § 552. See generally Note, The Freedom of Information Act and the Exemption for Intra-Agency Memoranda,86 Harv.L.Rev. 1047 (1973). Subject to such considerations as confidentiality and the need for unencumbered intra-agency circulation of preliminary views, see International Paper Co. v. FPC, 438 F.2d 1349, 1358-59 (2d Cir.), cert. denied, 404 U.S. 827, 92 S.Ct. 61, 30 L.Ed.2d 56 (1971); Ackerley v. Ley, 137 U.S.App.D.C. 133, 420 F.2d 1336, 1341 (1969), approved staff reports that are relevant should generally be made available to parties in an agency proceeding. See, e. g., GSA v. Benson, 415 F.2d 878, 880-81 (9th Cir. 1969). Nevertheless, any failure of discovery here does not warrant reversal since the "primary line" report would have been merely cumulative of the substantial evidence already in the record on this function of the Gilboa-Leeds line.
 
 
 22
 Petitioners also allege that the environmental impact statement is not based on sufficient independent staff analysis, see C.F.R. § 281(b), fails to use an interdisciplinary approach, and is too abstract and too argumentative. We disagree. At the hearing the FPC staff experts testified that, as required by NEPA, see Greene County I, 455 F.2d at 420, they had conducted their own evaluation of the need for, and impact of, the transmission line; their reliance on PASNY computer studies and on power-flow data routinely recorded by the PASNY and other electric utilities was not an unreasonable abrogation of their analytical responsibilities. As for the other criticisms, we have read the impact statement and find them to be unpersuasive.
 
 III.
 
 23
 With respect to the intervenors' attorneys' fees and witness expenses the Commission denied all requests for reimbursement, holding that it lacked the authority to make such payments and that none of the intervenors deserved such compensation in any event since they had only been "protecting their own interests." When the same matter was before us in Greene County I, we had declined to order the FPC to reimburse intervenors in the absence of express Congressional authorization. 455 F.2d at 426.
 
 
 24
 While this appeal has been pending, however, the Office of the Comptroller General has announced that in its opinion the FPC does have authority to pay for intervenors' expenses. In Matter of Costs of Intervention Nuclear Regulatory Commission, Decision B-92288 (February 19, 1976), the Comptroller General ruled that the NRC has implied authority to reimburse impecunious intervenors. A letter of May 10, 1976 from the Comptroller General to the Oversight and Investigations Subcommittee of the House Committee on Interstate and Foreign Commerce indicates that this decision is equally applicable to the FPC and eight other agencies: "appropriated funds of each agency may be used to finance the costs of participants in agency hearings whenever the agency finds that (1) it cannot make the required determination unless it extends financial assistance to certain interested parties who require it, and whose representation is necessary to dispose of the matter before it; and (2) the party is indigent or otherwise unable to finance its participation."[3]
 
 
 25
 Since the Comptroller General is Congress's agent for the purpose of determining the legality of administrative expenditures, see 31 U.S.C. § 65(d), his decision "upon any question involving a payment to be made by (an agency) . . . shall govern the General Accounting Office in passing upon the account containing such disbursement." 31 U.S.C. § 74. The Comptroller General's decision is authoritative and cannot be reversed by a court unless clearly contrary to law. See Brunswick v. Elliott, 70 App.D.C. 45, 103 F.2d 746, 749 (1939).[4]
 
 
 26
 Although express statutory authorization is required before either a court or a regulatory commission can order one litigant to pay a prevailing litigant's expenses on the ground that the prevailing litigant represents the public interest, Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); Turner v. FCC,169 U.S.App.D.C. 113, 514 F.2d 1354 (1975), the Comptroller General has concluded that fee reimbursement is distinguishable from fee shifting because it involves no exercise of compulsion against a private party.
 
 
 27
 Since public hearings are integral to the functioning of an agency such as the FPC, authorization for reimbursement of indigent intervenors who make important contributions in these hearings can reasonably be found in the agency's general statutory mandate. See 16 U.S.C. § 793 ("The commission may make such expenditures . . . as are necessary to execute its functions."). On this basis the Comptroller General's decision is not clearly incorrect and as a consequence the FPC now appears to have authorization to pay intervenors' expenses.[5]
 
 
 28
 Still, the Commission has implied that even if it had the authority it would not grant fees and expenses to the petitioners because they were only "protecting their own interests," and it is argued that we should affirm on this ground. However, we have some doubts about the fairness of withholding funds from these particular intervenors. All intervenors in agency proceedings are engaged in protecting their perceived self-interests; otherwise they would not bother to intervene. Although the intervenors were acting in their own interests, they were at the same time serving the broader public interest in the preservation of unspoiled scenic countryside. They seem to have played an essential role in the proceedings: it was their evidence and advocacy that appears to have been responsible for persuading the Commission to reject the preference of its own staff and the PASNY for the slightly shorter route running through the Durham Valley.[6] Thus, the Commission was substantially aided in making its determination by the action of the intervenors. Where environmental issues are involved, a salutary public interest is served if the parties affected have the opportunity to express their views. Otherwise, the Commission could be limited to the information made available to it by the power companies and business interests directly involved. Moreover, it seems quite possible that the Durham and Greene County petitioners could qualify as "indigent" in that their litigation obligations may be unreasonably large in comparison to their financial resources.
 
 
 29
 Under these circumstances, where there is a good chance that the intervenors may meet the standards approved by the Comptroller General, we believe the equitable course is to remand to the Commission for reconsideration of its holding in light of the Comptroller General's recent decisions.
 
 
 30
 We leave it to the Commission to determine whether compensation is appropriate and, if so, what further proceedings are appropriate here in order to provide fair consideration of the petitioners' reimbursement request.[7]
 
 
 31
 All petitions for review are denied except that we remand to the Commission for further consideration of the petitioners' requests for reasonable reimbursement of their litigation expenses.
 
 VAN GRAAFEILAND, Circuit Judge, dissenting:
 
 32
 I concur with the majority that the petition for review of Greene County and the Town of Greenville be denied but disagree with my brothers' disposition of the petition of the Town of Durham and the Association for the Preservation of Durham Valley.
 
 
 33
 In 1972, when this case was before us on a prior appeal, we reviewed the statutory authority of the Federal Power Commission and found no basis "to extend the Commission's power to include paying or awarding the expenses or fees of intervenors." Greene County Planning Board v. FPC, 455 F.2d 412, 426 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). We are now advised that the Comptroller General, presumably after examining the same statutory provisions, has reached exactly the opposite conclusion. Moreover, appellants, Town of Durham and Association for the Preservation of Durham Valley, now demand that we direct the Federal Power Commission to comply with the Comptroller General's contrary interpretation of the law. I cannot agree that this is a proper role for this Court to play.
 
 
 34
 I can find no statute which empowers the Comptroller General to issue what is in effect a declaratory judgment clothing the Federal Power Commission with authority to disburse public funds, in the face of the Commission's own determination that it has no such power and this Court's finding in support thereof. See 2 West's Federal Practice Manual (1970) § 1721 at 162. His authority and responsibility as the auditing agent of Congress is to provide a sound accounting structure for the government from the standpoint of effective financial control and independent audit. 31 U.S.C. § 65(d); H.R.No. 2556, 1950 U.S.Code Cong. Service 3707, 3717. While the Comptroller General has not hesitated to withhold approval of disbursements which he has determined to be "illegal", some of his activities in this field have been said to be based upon "dubious authority" and to represent "questionable policy". T. Morgan, The General Accounting Office: One Hope for Congress to Regain Parity of Power With the President, 51 N.C.L.Rev. 1279, 1283 (1973). Be that as it may, his administrative control of the purse strings as the representative of Congress gives him power in this area which has not often been challenged by the courts. See, e. g., Brunswick v. Elliott, 103 F.2d 746, 750-51, 70 App.D.C. 45 (1939). However, when the Comptroller General has gone beyond the bounds of the authority which may legitimately be construed to be his, the courts have not hesitated to disregard his holdings. See Miguel v. McCarl, 291 U.S. 442, 54 S.Ct. 465, 78 L.Ed. 901 (1934); McCarl v. Cox, 56 App.D.C. 27, 8 F.2d 669, 671 (1925).[1]
 
 
 35
 No officer or agent of the United States may disburse public money unless authorized by Congress to do so. Royal Indemnity Co. v. United States, 313 U.S. 289, 294, 61 S.Ct. 995, 85 L.Ed. 1361 (1941); Heidt v. United States, 56 F.2d 559, 560 (5th Cir. 1932); Fansteel Metallurgical Corp. v. United States, 172 F.Supp. 268, 270, 145 Ct.Cl. 496 (1959). Congress has specifically provided that sums appropriated for the various branches of expenditure in the public service shall be applied solely to the objects for which appropriations were made and for no others, 31 U.S.C. § 628, and has prohibited any officer or employee from involving the government in any obligation for the payment of money for any purpose, in advance of appropriations made for such purpose, unless such obligation is authorized by law. 31 U.S.C. § 665(a). The Federal Power Commission has never deemed itself authorized to pay the legal fees of private litigants, and, a fortiori, has made no request of Congress for an appropriation to pay these fees. Authorization for this payment must come from Congress, Turner v. FCC, 169 U.S.App.D.C. 113, 514 F.2d 1354, 1356 (1975); it cannot be derived from a letter of the Comptroller General addressed to the chairman of a congressional committee.
 
 
 36
 31 U.S.C. § 74, relied upon by the majority, permits the head of an executive department, in his discretion, to apply to the Comptroller General for a commitment in advance that the GAO will not question the validity of a specific disbursement in passing upon the account of that department. Such commitment has never been requested by the Federal Power Commission in this case, because it has not sought to exercise the authority which the Comptroller General has conceded to it. In reviewing the determination of the Commission which is presently before us it is for this Court to decide all relevant questions of law and make all requisite statutory interpretations. 5 U.S.C. § 706. Mulry v. Driver, 366 F.2d 544, 549 (9th Cir. 1966).[2] We abdicate our responsibility when we treat an unsolicited interpretation by the Comptroller General as the equivalent of a Supreme Court ruling, and needlessly inject the Federal Courts into an area of administrative discretion when we compel the Federal Power Commission to conform its practices to what the Comptroller General opines are proper. Cf. Greene County Planning Board v. FPC, supra, 455 F.2d at 427.[3]
 
 
 37
 Even if my brothers are correct in holding that we must require the Federal Power Commission to follow the Comptroller General's ruling, we should not go beyond the scope of that ruling. The Comptroller General's stated position is that only the administrative agency involved can make the determination as to whether payment of the expenses of indigent intervenors is appropriate. The Commission, recognizing that Durham intervened for the protection of its own interests, found payment of its attorneys' fees to be inappropriate. We should not require the Commission to reconsider its discretionary determination merely because we have some doubts about its fairness. 5 U.S.C. § 701(a)(2); Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608, 620 (2d Cir. 1965). Reimbursement of the expenses of private interests who "may sometimes cloak themselves with a semblance of public interest advocates", Office of Communication of United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 359 F.2d 994, 1006 (1966), is a matter properly within the cognizance of the agency involved.
 
 
 38
 For the foregoing reasons, I respectfully dissent from that portion of the majority's decision which grants the petition of the Town of Durham and the Association for the Preservation of Durham Valley.
 
 ON REHEARING EN BANC
 
 39
 Before KAUFMAN, Chief Judge, and LUMBARD, MANSFIELD, MULLIGAN, OAKES, GURFEIN, VAN GRAAFEILAND and MESKILL, Circuit Judges.*
 
 
 40
 Petition for review of that portion of an order of the Federal Power Commission denying requests of Greene County Planning Board, Town of Greenville, Town of Durham and Association for the Preservation of Durham Valley for payment of litigation expenses.
 
 
 41
 Petition denied by court sitting en banc.
 
 VAN GRAAFEILAND, Circuit Judge:
 
 42
 After six years of litigation over the construction of a power line in Greene County, New York, the dispute between the parties has resolved itself into the issue of whether the Federal Power Commission is authorized to award counsel fees to petitioners who opposed the construction.
 
 
 43
 In 1972, when this case was before us on a prior appeal, we held that the Federal Power Act did not authorize the making of such an award. Greene County Planning Board v. Federal Power Commission, 455 F.2d 412, 426 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). Following that decision, further hearings were held before the Commission, at the conclusion of which it denied petitioners' requests for counsel fees and expenses. Relying upon our ruling and upon the Supreme Court's decision in Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the Commission found that it was not empowered to grant petitioners' requests. It also said in its opinion (No. 751, January 21, 1976):
 
 
 44
 These intervenors are protecting their own interests, and we see no reason to grant them fees and expenses. If they were generally allowed, a large financial burden would be imposed on this Commission and the taxpayer or upon the utility involved and inevitably on its rate payers. In the absence of a mandate in the statute we are loath to attempt such an expensive departure from past practice.
 
 
 45
 Upon appeal, a panel of this Court, with one judge dissenting, reversed that portion of the order disallowing the applications for fees and remanded to the Commission for further consideration of petitioners' requests.[1] Petitions for en banc consideration were granted solely as to this issue and a majority of the Court, sitting en banc, hold that the petition for review of that portion of the Commission's order denying an award of attorneys' fees should be denied.
 
 
 46
 In arguing for remand, petitioners rely upon an interpretation of the Federal Power Act by the Comptroller General of the United States which is contrary to our own. In Matter of Costs of Intervention Nuclear Regulatory Commission, B-92288 (Feb. 19, 1976), the Comptroller General held that the NRC had statutory authority to pay the legal expenses of intervenors. In a subsequent letter addressed to the Oversight and Investigations Subcommittee of the House of Representatives' Committee on Interstate and Foreign Commerce, the Comptroller General stated that this opinion was applicable to nine other agencies, including the Federal Power Commission. We are thus met squarely with the issue of whether this Court's interpretation of the Federal Power Act or that of the Comptroller General shall control the disposition of this appeal. We hold that our interpretation must control.
 
 
 47
 Congress has specifically provided that "(t)o the extent necessary to decision . . . the reviewing court shall decide all relevant questions of law," and "interpret constitutional and statutory provisions" and shall "hold unlawful and set aside agency action . . . in excess of statutory jurisdiction, authority or limitations . . . ." 5 U.S.C. § 706; see Mulry v. Driver, 366 F.2d 544, 549 (9th Cir. 1966). We are not prepared to abdicate the responsibility thus conferred by holding that the authority of the Federal Power Commission is to be determined by the Comptroller General's interpretation of the law rather than our own.
 
 
 48
 31 U.S.C. § 74 permits the head of an executive department, in his discretion, to apply to the Comptroller General for a commitment in advance that the General Accounting Office will not question the validity of a specific disbursement in passing upon the account of that department.[2] A commitment given in response to such a request operates as a form of estoppel against subsequent challenge by the GAO. It is not, however, a binding legal opinion, but one which may be contested in the courts. United States ex rel. Brookfield Construction Co. v. Stewart, 234 F.Supp. 94, 100 (D.D.C.), aff'd, 119 U.S.App.D.C. 254, 339 F.2d 753 (1964). It is for the courts to determine the intent of Congress as expressed in its legislative enactments. In making this determination, as we do in this case, we interfere in no way with the authority of the Comptroller General to approve or disapprove disbursements made by executive agencies. We simply hold that the Federal Power Commission has no statutory authority to make the disbursements in question. Cf. Miguel v. McCarl, 291 U.S. 442, 54 S.Ct. 465, 78 L.Ed. 901 (1934).
 
 
 49
 We note that in Matter of Costs of Intervention Nuclear Regulatory Commission, supra, the Comptroller General did not merely hold that the NRC had authority to pay legal expenses of intervenors; he specified the conditions under which payment could be made. He said: (1) NRC must believe that participation by the intervenor is required by statute or necessary to represent adequately opposing points of view; (2) the intervenor must be indigent or otherwise unable to bear the financial cost of participation. Subsequently, although there were no statutory changes, the Comptroller General modified these conditions, holding that payment is authorized if an agency determines that an expenditure for participation "can reasonably be expected to contribute substantially to a full and fair determination" of the issues even though the expenditure might not be essential. See Matter of Costs of Intervention Food and Drug Administration, B-139703 (Dec. 3, 1976). The Comptroller General also perceived no legal objection to the making of awards "solely to ensure that a potentially affected interest is represented" or to giving the "representational role of the participant special weight in deciding whether to provide financial assistance." Id.
 
 
 50
 The authority of a Commission to disburse funds must come from Congress, Turner v. FCC, 169 U.S.App.D.C. 113, 514 F.2d 1354, 1356 (1975); and it is for Congress, not the Comptroller General, to set the conditions under which payments, if any, should be made. No officer or agent of the United States may disburse public money unless authorized by Congress to do so. Royal Indemnity Co. v. United States, 313 U.S. 289, 294, 61 S.Ct. 995, 85 L.Ed. 1361 (1941); Heidt v. United States, 56 F.2d 559, 560 (5th Cir. 1932); Fansteel Metallurgical Corp. v. United States, 172 F.Supp. 268, 270, 145 Ct.Cl. 496 (Ct.Cl.1959). Sums appropriated for the various branches of expenditure in the public service must be applied solely to the objects for which appropriations were made and for no others. 31 U.S.C. § 628. Congress has shown a lively interest in the matter of financial assistance for intervening parties, and legislation dealing with this subject has been introduced in both the 94th and 95th Sessions of Congress.[3] In light of the Supreme Court's very broad language in Alyeska Pipeline Service Co. v. Wilderness Society, supra, 421 U.S. at 257, 95 S.Ct. at 1621, that "absent statute or enforceable contract, litigants pay their own attorneys' fees", a finding that the Federal Power Commission is empowered to reimburse intervenors for their legal expenses must await appropriate Congressional action.
 
 
 51
 The petitions for review are denied.
 
 IRVING R. KAUFMAN, Chief Judge (concurring):
 
 52
 I would add only one brief comment to my brother Van Graafeiland's reasoned opinion. The decision whether to expend public funds to advance an essentially private point of view by its very nature is political and, in a democracy, more appropriately made by the elected representatives of the people. All interested individuals can claim, with utmost sincerity, to represent the "public". Some selection among potential intervenors becomes necessary, therefore, to assure a fair and balanced presentation of the various viewpoints while insuring, at the same time, that the agency does not exceed its financial constraints. Such choices are particularly unamenable to judicial structuring. Indeed, the Supreme Court, in the Alyeska Pipeline case, refused to give the courts the right to determine, in the absence of legislative guidelines, which public policies are sufficiently important to warrant exceptions from the general prohibition of fee shifting. And the Comptroller General himself in Matter of Costs NRC, at 8, stated:
 
 
 53
 . . . (W)e believe it would be advisable for the parameters of such financial assistance, and the scope and limitations on the use of appropriated funds for this purpose to be fully set forth by the Congress in legislation, as was done in the case of the FTC by the "Magnuson-Moss" Act.
 
 
 54
 Our three prior decisions in this seemingly interminable case demonstrate the critical and important role that intervenors can play in agency decision-making. I believe that expanded participation by advocates of a variety of public interests before agencies would tend to decrease the number of appeals taken to the federal courts and also the number of cases remanded to agencies because the record failed to reflect adequate consideration of the concerns of all affected parties. Nevertheless, if Congress is of the view, as I am, that a reliable source of funding is a sine qua non to effective public participation in agency proceedings, it should appropriate money to that end. At the same time it should establish a comprehensive and flexible framework that will assure vigorous and independent representation of the public interest and avoid potential abuses.
 
 
 55
 Thus, while I agree with my dissenting brethren that public funding has become necessary to the optimal functioning of the administrative process, I do not agree that the decision of the en banc majority is an "unfortunate step backward." I would rather characterize it as an eschewal of the inevitable pitfalls of "judicial lawmaking" in the face of congressional inability to resolve the dilemmas posed by these sensitive issues.
 
 
 56
 LUMBARD, Circuit Judge, with whom MANSFIELD and OAKES, Circuit Judges, join (dissenting):
 
 
 57
 I respectfully dissent from the en banc court's decision. In view of the Comptroller General's recent decision on agency reimbursement of intervenors' expenses, I believe we should remand to the FPC for further consideration of the intervenors' request in this case. I do not think the Commission's authority to pay intervenors' litigation expenses has been precluded by our decision in Greene County Planning Board v. FPC, 455 F.2d 412 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972), or by the Supreme Court's decision in Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).
 
 
 58
 The question raised in Greene County I was whether the court should order the Commission to pay for intervenors' expenses. On this issue, the panel concluded:
 
 
 59
 (W)e find ourselves in agreement with the Commission's position that at this posture of the proceedings and under current circumstances, without a clearer congressional mandate we should not order the Commission . . . to pay the expenses and fees of petitioners . . . .
 
 
 60
 Without a showing of compelling need, it would be premature for us to inject the federal courts into this area of administrative discretion, perhaps foreclosing more flexible approaches through agency action or rules.
 
 
 61
 455 F.2d at 426, 427.
 
 
 62
 In deciding whether the FPC could be required by court order to pay intervenors' expenses the Greene County I panel considered two statutes, § 309 of the Federal Power Act, 16 U.S.C. § 825h, which deals with the FPC's rulemaking powers, and § 314(c) of that Act, 16 U.S.C. § 825m(c), which authorizes the Commission to employ attorneys for its own use. Finding no such requirement in these statutes, the panel understandably reasoned that a court should not order an agency to disburse funds "(without) a far clearer congressional mandate," 455 F.2d at 426.
 
 
 63
 Such caution was appropriate: since the power of the purse belongs to Congress, a court is not free to disburse agency funds whenever it thinks this would be fair. Not only would such judicial freelancing impinge on Congress' constitutional prerogatives, it would also tend to place administrators in the embarrassing position of trying to follow a court's order without any assurance that the funds would be available. For this reason, courts have declined to order agency disbursements over the opposition of Congress' auditing agent, the Comptroller General, except where the duty to pay is "free from doubt." Compare Brunswick v. Elliot, 70 App.D.C. 45, 103 F.2d 746, 750-51 (1939), with Miguel v. McCarl, 291 U.S. 442, 454, 54 S.Ct. 465, 78 L.Ed. 901 (1934).[1]
 
 
 64
 We are now dealing with a different issue, which is whether the Commission has discretionary authority to pay for intervenors' expenses if it considers such reimbursement to be necessary or desirable. That federal agencies possess such discretionary authority has been recognized by the Comptroller General since the Greene County I panel decision, and in the case of the FPC would be based on two statutes that were not considered by that panel, § 308 of the Federal Power Act, 16 U.S.C. § 825g,[2] which deals with Commission hearings, and the statute enacted by Congress which provides a general appropriation to pay for "expenses necessary for the work of the Commission," 90 Stat. 889, 898.[3] As head of the General Accounting Office, the Comptroller General has the power to pass in advance on the legality of administrative expenditures. See 31 U.S.C. § 74.[4] Approval by the Comptroller General assures the agency making the disbursement that the necessary funding will not later be withheld by Congress. By his decision in Matter of Costs of Intervention Nuclear Regulatory Commission, Dec. B-92288 (Feb. 19, 1976), and Matter of Costs of Intervention Food & Drug Administration, Dec. B-139703 (Dec. 3, 1976), and by his May 10, 1976 letter to the Oversight and Investigations Subcommittee of the House Committee on Interstate and Foreign Commerce, the Comptroller General has categorically held that the FPC has discretionary authority to reimburse expenses of impecunious intervenors who " 'contribute substantially to a full and fair determination of' the issues before it." Costs of Intervention FDA, supra at 5.
 
 
 65
 Since the Comptroller General is Congress' chief agent for guarding the public fisc, his opinions on expenditure issues are comparable to those of an agency in its area of special responsibility, and they are entitled to at least as much deference from courts as is given to an enforcing agency's statutory interpretations, see, e. g., Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 272, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). Judicial deference is particularly appropriate here where the Comptroller General's interpretation is one which limits rather than expands his power over the purse strings. Compare FMC v. Seatrain Lines, Inc., 411 U.S. 726, 745-46, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973).
 
 
 66
 The Comptroller General based his decision on the proposition that:
 
 
 67
 where an appropriation is made for a particular object, purpose, or program, it is available for expenses which are reasonably necessary and proper or incidental to the execution of the object, purpose or program for which the appropriation was made, except as to expenditures in contravention of law or for some purpose for which other appropriations are made specifically available.
 
 
 68
 Costs of Intervention NRC, supra at 3. Since public hearings are integral to the functioning of an agency such as the FPC, authorization for reimbursement of indigent intervenors who make important contributions in these hearings can reasonably be found in the agency's general statutory mandate, see 16 U.S.C. § 793, as well as § 825g. See also Note, Federal Agency Assistance to Impecunious Intervenors, 88 Harv.L.Rev. 1815, 1828-29 (1975).
 
 
 69
 Although express statutory authorization is required before either a court or a regulatory commission can order one litigant to pay a prevailing litigant's expenses on the ground that the prevailing litigant represents the public interest, Alyeska Pipeline Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); Turner v. FCC, 169 U.S.App.D.C. 113, 514 F.2d 1354 (D.C.Cir.1975), fee reimbursement is distinguishable from fee shifting because it involves no direct exercise of compulsion against a private party.[5] Alyeska was decided in the context of a long history of cases upholding the "American Rule" against taxing attorneys' fees to the losing party, see 421 U.S. at 247-54, 95 S.Ct. 1612; a general statute for taxing costs, 28 U.S.C. § 1920, which was intended to be comprehensive and which omitted attorneys' fees from the list of allowable costs, see 421 U.S. at 255-56, 95 S.Ct. 1612; and a number of statutes explicitly authorizing attorneys' fees assessments in certain specific types of cases, see 421 U.S. at 260-62, 95 S.Ct. 1612. None of these factors is present here. Because "public interest" intervention is largely a recent development, there is no long-established rule against agency funding for intervenors. Congress has legislated on the subject only twice, see Toxic Substance Control Act, 15 U.S.C. § 2620(4)(C); Clean Air Act § 304(d); moreover, in declining to enact provisions for attorneys' fees payments in proceedings before the Nuclear Regulatory Commission, Congress declared that its intention was to let the NRC decide for itself whether parties should be given reimbursement for attorneys' fees. See House Conference Rep.No. 93-1445, 1974 U.S.Code Cong. & Admin.News at 5550-51. Accordingly, I conclude that it was altogether reasonable for the Comptroller General to find that agency reimbursement of intervenors' attorneys' fees need not await further legislation from Congress.[6]
 
 
 70
 The decision of the en banc majority seems an unfortunate step backwards. Public funding for public interest intervenors has become necessary to the optimal functioning of the administrative process. Involvement in administrative proceedings is time-consuming and expensive, and where individual interests are diffuse and noneconomic these costs are a substantial barrier to effective participation.[7] When good citizens are willing to give their time and money to voice a broader public interest and thus to make useful contributions to government decisionmaking, there should be some means for reimbursing their reasonable attorneys' fees, expert witness costs, and other expenses. Otherwise, many good causes will be crippled because of financial limitations on presentation, and many others will go unpled. Intervenors who represent public interests in addition to their own interests have important contributions to make to the regulatory process.[8] Where such intervenors aid an agency in performing its statutory duties, it is only fair that the costs of intervention should be treated as part of the cost of agency administration.
 
 
 
 *
 Sitting by designation
 
 
 [1]
 Greene County Planning Board v. FPC, 455 F.2d 412 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972); Greene County Planning Board v. FPC, 490 F.2d 256 (2d Cir. 1973); Greene County Planning Board v. FPC, 528 F.2d 38 (2d Cir. 1975)
 
 
 [2]
 The intervenors again sought a stay of the hearing from this court, this time on the basis of inadequacies in the impact statement; but these challenges were rejected as premature in Greene County Planning Commission v. FPC (Greene County II), 490 F.2d 256 (2d Cir. 1973)
 
 
 [3]
 It appears from the record that neither of the Comptroller General's rulings were considered by the Commission when it reached its decision in the instant case. The February 19 ruling on the NRC was issued just one week before Durham's petition for rehearing was filed, and no reference is made to the NRC ruling in either the rehearing petition or the Commission's denial of that petition. The May 10 letter, which dealt with the FPC specifically, postdates all of the Commission's decisions on reimbursement in this case
 
 
 [4]
 Miguel v. McCarl, 291 U.S. 442, 54 S.Ct. 465, 78 L.Ed. 901 (1934), and McCarl v. Cox, 56 App.D.C. 27, 8 F.2d 669, 671 (1925), cited by Judge Van Graafeiland in his dissent, were cases where the Comptroller General's rulings were clearly contrary to law
 
 
 [5]
 Reasonable reimbursement should include reimbursement for out-of-pocket expenses incurred by the intervenors, reimbursement for experts' fees and expenses, payment of reasonable attorneys' fees to intervenors' counsel, and reimbursement for out-of-pocket expenses and disbursements incurred by counsel
 
 
 [6]
 The intervenors also may deserve some credit for the Commission's decision to use single rather than double sets of towers and a narrower right-of-way
 
 
 [7]
 We recognize that the task of developing detailed standards for awards to intervenors may best be accomplished through rulemaking or through legislation, but this does not mean that the Durham petitioners are not entitled at least to a reasoned explanation for the withholding of reimbursement in their case
 
 
 [1]
 For discussions of the question of judicial review, see H. Mansfield, Judicial Review of the Comptroller General, 20 Cornell L.Q. 459 (1935); see also Note, 3 Geo.Wash.L.Rev. (1934) at 97
 
 
 [2]
 In so doing, we should not overlook the Commission's own interpretation of its statutory powers and the practices adopted by it pursuant thereto. See Lucas v. American Code Co., 280 U.S. 445, 449, 50 S.Ct. 202, 74 L.Ed. 538 (1930)
 
 
 [3]
 The majority's attempt to find support for the Comptroller General's decision in the provisions of 16 U.S.C. § 793, which authorizes the Commission to make expenditures "necessary to execute its functions", is in clear contradiction of our prior holding in Greene County Planning Board v. FPC, supra, 455 F.2d 412. A commission's "functions" cannot exceed its powers. The administrative powers of the Federal Power Commission are set forth in section 309 of the Federal Powers Act, 16 U.S.C. § 825(h), and we held in Greene that such powers did not include the paying or awarding the expenses or fees of intervenors
 We also pointed out in Greene, at 427, that in 1971 the Administrative Conference of the United States "refused to adopt a recommendation which would have endorsed the principle of reimbursing the legal expenses incurred by intervenors in administrative proceedings." Since then, Congress has had legislation under consideration which would authorize administrative agencies to award litigation expenses to intervenors, depending on their contribution to the decision making process. See S.Rep.No.94-863, 94th Cong., 2d Sess. (1976). Until Congress, the people's chosen representative, speaks, it is "inappropriate" for this authorization to be granted by anyone else. Alyeska Pipeline Co. v. Wilderness Society, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).
 
 
 *
 Judges FEINBERG and TIMBERS did not participate in the consideration or determination of this rehearing
 
 
 [1]
 The panel opinion left intact the orders of the Federal Power Commission which authorized construction of an electrical transmission line by the Power Authority of the State of New York
 
 
 [2]
 The Federal Power Commission has never deemed itself authorized to pay the legal fees of private litigants and has sought no commitment from the Comptroller General as to the validity of such payments. This interpretation of the Federal Power Act by the agency charged with its administration is entitled to great deference from this Court. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965)
 
 
 [3]
 Congress is presently deliberating three bills dealing with the subject of intervenors' costs. They are collectively identified as "Public Participation in Federal Agency Procedures Act of 1977", S.270, H.R. 3361 and H.R. 3362
 
 
 [1]
 An adverse Comptroller General's ruling does not prevent a claimant from pursuing a suit for money damages against the United States in the Court of Claims. United States ex rel. Brookfield Construction Co. v. Stewart, 234 F.Supp. 94, 100 (D.D.C.), aff'd 119 U.S.App.D.C. 254, 339 F.2d 753 (1964); see, e. g., Iran Nat'l Airlines Corp. v. United States, 360 F.2d 640, 641-42, 175 Ct.Cl. 504 (1966)
 
 
 [2]
 16 U.S.C. § 825g(a) provides:
 (a) Hearings under this chapter may be held before the Commission, any member or members thereof or any representative of the Commission designated by it . . . . In any proceeding before it, the Commission, in accordance with such rules and regulations as it may prescribe, may admit as a party any interested State, State commission, municipality, or any representative of interested consumers or security holders, or any competitor of a party to such proceeding, or any other person whose participation in the proceeding may be in the public interest.
 
 
 [3]
 The FPC's appropriation was for the fiscal year here in question over $41 million. The Commission is authorized by 16 U.S.C. § 793 to make "such expenditures . . . as are necessary to execute its functions." Moreover, under section 6 of the Federal Power Act, 16 U.S.C. § 799, licenses issued by the Commission include the condition of section 10(e) that the licensee pay a share of the Commission's administrative costs. Thus the license is in the nature of a contract under which the licensee expressly agrees to share administrative costs, including fees required to be paid
 
 
 [4]
 In passing on the legality of expenditures, the Comptroller General has a "judicial duty" to "determine finally the construction of statutes." See Joint Commission Report, 26 Cong.Rec. at 7483-84 (1894); 21 Op. (Atty.Gen.) 178, 181 (1895)
 
 
 [5]
 Here, indeed, there is not the fee-shifting that was prescribed in Alyeska ; at least to the extent of the Commission's own general appropriation, note 3 supra and accompanying text, any fees paid to intervenors can properly be said to come from the Commission's own funds, not those of the licensee. To the limited extent that this might not be true, moreover, by virtue of the licensee's statutory duty under section 10(e) of the Federal Power Act, 16 U.S.C. § 803(e), to pay a share of the Commission's administrative costs included as a condition of the license which is agreed to by the licensee under section 6, 16 U.S.C. § 799, any "shifting" of fees involved would be done by the contract the license itself. This is perfectly proper under Alyeska, 421 U.S. at 257, 95 S.Ct. at 1621 ("the general rule that, absent statute or enforceable contract, litigants pay their own attorneys' fees") (emphasis added)
 
 
 [6]
 Despite the fears expressed by my brother Kaufman about "judicial structuring" and "judicial lawmaking," I see no cause for concern here. It would be the administrative agency, and not the court, which in the first instance would determine whether intervenors make a substantial enough contribution to the administrative process to merit a fee award
 
 
 [7]
 See 88 Harv.L.Rev. at 1819 & n. 23
 
 
 [8]
 See Leventhal, Attorneys' Fees for Public Interest Representation, 62 A.B.A.J. 1134 (1976)