664 F.2d 1221
 62 A.L.R.Fed. 834
 PACIFIC LEGAL FOUNDATION, Appellant,
v.
Jere E. GOYAN, in his official capacity as Commissioner of
the Food and Drug Administration, Appellee.
Public Citizen Litigation Group, Amicus Curiae.
 No. 80-1854.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 4, 1981.
Decided Nov. 27, 1981.
 
 Eileen B. White, Washington, D. C. (Raymond M. Momboisse, Pac. Legal Foundation, Washington, D. C., Ronald A. Zumbrun, Pac. Legal Foundation, Sacramento, Cal., on brief), for appellant.
 Bruce N. Bagni, Civ. Div., Dept. of Justice, Washington, D. C. (Thomas S. Martin, Acting Asst. Atty. Gen., Washington, D. C., Russell T. Baker, Jr., U. S. Atty., Baltimore, Md. Leonard Schaitman, Civ. Div., Dept. of Justice, Washington, D. C., on brief), for appellee.
 Frederic Townsend, Alan B. Morrison, Washington, D. C., on brief for amicus curiae Public Citizen.
 Before WIDENER and MURNAGHAN, Circuit Judges, and BRITT, District Judge.*
 BRITT, District Judge.
 Plaintiff, a non-profit corporation, filed this action on 3 December 1979 in the District Court of Maryland, seeking declaratory and injunctive relief prohibiting implementation of a regulation of the Food and Drug Administration (FDA). The regulation was established to provide "payment from agency funds of reimbursement for reasonable attorneys' fees, expert witness fees, the expenses of clerical services, travel, studies, demonstrations, and other reasonable and necessary costs of participation incurred by a participant ... in an agency proceeding ... that results in a hearing ...."[1] Both parties filed motions for summary judgment and defendant filed a motion to dismiss based on plaintiff's lack of standing to maintain the action. The District Court determined that plaintiff did have standing to sue and denied the motion to dismiss. Finding no dispute as to the facts, the District Court decided the legal questions presented in favor of defendant and allowed his motion for summary judgment. Plaintiff appealed.
 FACTUAL BACKGROUND
 On 25 August 1976 the FDA issued an advance notice[2] of proposed rulemaking announcing its consideration of the rule here in question as a pilot program. The expressed purpose of the program is "... to determine whether the process of administrative decision-making will be enhanced by reimbursing participants whose participation in agency proceedings contributes or can reasonably be expected to contribute to a full and fair determination of the issue, but who would otherwise be unable to participate effectively."[3]
 Plaintiff corporation, whose offices are in California, engages in research, study and litigation in matters affecting the public interest, such as participating in proceedings before public agencies, including the FDA. It filed comments with the FDA opposing the adoption of the proposed regulations on the ground that the expenditure of the funds necessary to implement the proposal had not been approved by the Congress.
 Relying in part on a decision of the Comptroller General[4] that it did have authority under existing law for such expenditures, the FDA issued its proposed rule on 17 April 1979.[5] The final rule was published on 12 October 1979 and $250,000 was allocated by the FDA for the program.
 The decision as to who will receive reimbursement is made by an Evaluation Board consisting of FDA officials.[6] In deciding who should receive reimbursement, the Board is required to consider (1) the value of each applicant's contribution to a full and fair determination of the issues in the proceedings; (2) whether the applicant represents a significant interest that would not otherwise be adequately represented; (3) whether the applicant can competently represent the interest it advocates; and (4) whether the applicant has available sufficient resources to participate effectively in the proceeding without FDA compensation.[7] Reimbursement is limited to the rate paid by the FDA to its expert witnesses, attorneys, consultants, or other employees performing similar services.[8]
 QUESTIONS FOR REVIEW
 Whether plaintiff has standing to maintain this action and whether defendant has authority to spend public funds to reimburse qualified participants in its proceedings are the issues this Court has to decide. For the reasons hereafter set forth, we agree with the District Court that plaintiff has standing but disagree with the conclusion that defendant has authority to reimburse and, therefore, reverse.
 I. STANDING
 Only the complaint and certain exhibits were before the District Court upon its decision on the cross-motions for summary judgment. That being true:
 For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.
 Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).
 Plaintiff alleged in its complaint:
 PLF engages in research, study, and litigation in matters affecting the public interest. PLF has over 9,000 supporters and contributors from all areas of the country, who as citizens and taxpayers have a substantial interest in seeing that federal monies are expended only as mandated by Congress....
 PLF frequently participates in FDA proceedings and stands to be injured by the implementation of the public participation funding program. Reimbursement cannot be provided without unduly delaying agency proceedings since the officer presiding over applications for reimbursement has discretion to delay proceedings for an indeterminate period of time. PLF, once it has committed itself to a proceeding, will be devoting its limited resources to that proceeding to the detriment of other issues necessitating its representation in the public interest.
 PLF will necessarily have to expend more resources in order to be certain that the public interest is represented equally as well as the special interest representatives seeking reimbursement who claim to represent "the public," but who are unable to raise money from that "public" to support participation in FDA proceedings.
 Additionally, PLF alleges that it is an "interested person" as defined in Title 21 C.F.R. 10.3(12) (1979) and thus specifically has standing to obtain judicial review of the FDA's "final action" under Title 21 C.F.R. 10.45(d)(1) (ii) (1979).
 Justice Powell in Warth, 422 U.S. at 498, 95 S.Ct. at 2205, set forth the following general principles with regard to standing:
 
 
 1
 In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.... In both dimensions it is founded in concern about the proper-and properly limited-role of the courts in a democratic society....
 
 
 2
 In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a "case or controversy" between himself and the defendant within the meaning of Art. III. This is the threshold question in every federal case, determining the power of the court to entertain the suit. As an aspect of justiciability, the standing question is whether the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf.
 
 
 3
 Since plaintiff has participated in FDA proceedings in the past we agree with the conclusion of the District Court that "... if it is to maintain its institutional presence in these proceedings it is quite possible that it will suffer increased costs as a result of the new reimbursement procedures." Pacific Legal Foundation v. Goyan, 500 F.Supp. 770, 773 (D.Md.1980). We find that plaintiff has alleged the requisite "direct injury" to give it standing because of the increased time and expense necessary for it to monitor not only proposals by the FDA and comments thereto, but also proposals by applicants for reimbursement under the program here in question. It would seem only natural for plaintiff to increase its vigilance and efforts if defendant's proposed program is a success because the greater the number of direct views that are presented the more plaintiff will need to counter or support these views. We are unpersuaded by defendant's contention that while it may be that PLF will choose to expend more time and funds in order to counter heretofore absent opposing opinions, that is a decision to be made by PLF. This begs the question as plaintiff's motive for being interested in FDA proceedings is not relevant to the question of standing.
 
 
 4
 Finding sufficient direct injury to sustain plaintiff's standing, we deem it unnecessary to determine whether plaintiff's contention that it has statutory standing is correct.
 
 II. DEFENDANT'S AUTHORITY TO REIMBURSE
 
 5
 It is undisputed that Congress has not specifically authorized the program here in question. The FDA contends, however, that it has the implied power to expend the funds necessary to carry out the proposal. The FDA's reasoning, adopted by the District Court, is that since it has broad regulatory powers under the Act and since "(a)s part of its regulation of the many products subject to its jurisdiction, the FDA is often required to hold hearings and to base its decisions concerning the products it regulates solely on the record developed in those hearings," it had the power to establish this program "to ... enhance the efficiency and quality of its administrative proceedings by providing for a greater diversity of views." Id. at 774. Appellants contend that no such implied authority can be found and that, instead, such expenditures are prohibited by 31 U.S.C. §§ 665(a)[9] and 628.[10] Resolution of this issue turns on an examination of both the historical context in which this dispute arises and the extent to which Congress has authorized the expenditures in question.
 
 
 6
 It has always been the practice in this country's jurisprudence for a party to pay its own litigation expenses. Thus, in the absence of specific statutory authorization, a court is without authority to compel the losing party to pay the attorneys' fees of his successful opponent. Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).[11] In that case the Supreme Court held that attorneys' fees may not be awarded to an environmental organization which prevailed against a pipeline company in an action to prevent issuance of permits by the Secretary of Interior for construction of an oil pipeline. The Court of Appeals for the District of Columbia Circuit had awarded fees under the private-attorney-general concept, there being no statutory authorization for the award. In the course of its opinion the Court reviewed statutes wherein Congress had authorized the payment of attorneys' fees and went on to hold that Congress-and not the courts-was in the best position to decide which statutes were important enough to warrant attorneys' fees awards.
 
 
 7
 Alyeska Pipeline arose in the context of traditional adversary litigation where the prevailing party actually sought to shift its obligation for its own attorney's fees to the loser. That is, of course, not precisely the issue involved in this proceeding. The FDA instead seeks to pay the expenses of participants from the public purse rather than tax them against unsuccessful participants in the administrative proceeding. Nonetheless, Alyeska Pipeline demonstrates the continuing vitality of the rule that, absent congressional authority to the contrary, participants pay their own way in legal proceedings, compelling this court to examine carefully the source of the FDA's claimed authority.
 
 
 8
 Whether administrative agencies may reimburse public participants is a subject on which Congress has spoken on several occasions. In at least three instances, Congress has expressly authorized administrative agencies to follow the practice contemplated by the FDA rule:
 
 
 9
 1. The Magnuson-Moss Warranty-Federal Trade Improvement Act, § 202(a)(h)(1), 15 U.S.C. § 57a(h)(1) (1976), provides that the Federal Trade Commission may "provide compensation for reasonable attorneys fees, expert witness fees, and other costs of participating in a rulemaking proceeding ...".
 
 
 10
 2. The Toxic Substances Control Act, § 6(c)(4), 15 U.S.C. § 2605(c)(4) (1976), makes provision for "compensation for reasonable attorneys' fees, expert witness fees and other costs of participating in a rulemaking proceeding ...".
 
 
 11
 3. The Foreign Relations Authorization Act, § 22, 22 U.S.C. § 2692 (1976), provides that "(t)he Secretary of State may compensate ... for the cost of participating in any proceeding ... any organization or person ..." meeting certain qualifications.
 
 
 12
 Even though Congress has shown its willingness to provide for participant reimbursement, it has on several other occasions expressly rejected the notion of a general authorization for all agencies to do so.[12] Although the power to spend-constitutionally reserved to the Congress[13]-may be delegated to others, either expressly or impliedly, a claim of implied delegation must be scrutinized carefully, especially where Congress clearly has shown it will speak in express terms when it so desires.
 
 
 13
 It was against this same background that an en banc Second Circuit decided Greene County Planning Board v. Federal Power Commission, 559 F.2d 1227 (2d Cir. 1976), cert. denied 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). That decision reversed an earlier split panel, the majority of which had directed the Federal Power Commission to pay the expenses of participant intervenors in an administrative proceeding before it. As in this case, the Comptroller General had informed the Federal Power Commission that it had implied authority to reimburse participants based on its general enabling legislation. Based both on Congress' "lively interest" in this area and on the broad holding of Alyeska Pipeline that the obligation to pay fees is to be shifted only by express congressional action, the court found no such implied authority.
 
 
 14
 Appellee seeks to escape the holding of Greene County by relying on the fact that the legislative history of the appropriations bills for 1979 and 1980 tend to indicate that funding for the program here in question was contemplated. No doubt the courts must look to any and all aspects of reported congressional proceedings to try to glean the true legislative intent. However, it must be recognized that there is more than a passing distinction between substantive legislation and appropriations bills. Andrus v. Sierra Club, 442 U.S. 347, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979); Tennessee Valley Authority v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). In Tennessee Valley Authority, Justice Brennan, speaking for the Court, said:
 
 
 15
 ... We recognize that both substantive enactments and appropriations measures are "Acts of Congress," but the latter have the limited and specific purpose of providing funds for authorized programs. When voting on appropriations measures, legislators are entitled to operate under the assumption that the funds will be devoted to purposes which are lawful and not for any purpose forbidden. Without such an assurance, every appropriations measure would be pregnant with prospects of altering substantive legislation, repealing by implication any prior statute which might prohibit the expenditure. Not only would this lead to the absurd result of requiring Members to review exhaustively the background of every authorization before voting on an appropriation, but it would flout the very rules the Congress carefully adopted to avoid this need.[14]
 
 
 16
 437 U.S. at 190, 98 S.Ct. at 2300.
 
 
 17
 The District Court placed little weight on the rejection by Congress of the bills specifically authorizing participant reimbursement, see n.12 supra, saying "(r)eliable conclusions as to congressional intent cannot be drawn from the failure of Congress to enact legislation." Pacific Legal Foundation, 500 F.Supp. at 775. Whether more weight should be given to committee history of an appropriation bill than to rejection of proposed legislation is debatable. Suffice to say, however, we feel that the intent of Congress must be clear to authorize a concept in congressional funding heretofore accomplished only through express authorization. In Alyeska Pipeline the Court said that Congress has not
 
 
 18
 ... extended any roving authority to the Judiciary to allow counsel fees as costs or otherwise whenever the courts might deem them warranted. What Congress has done, however, ... is to make specific and explicit provisions for the allowance of attorneys' fees under selected statutes granting or protecting various federal rights. ... Congress itself presumably has the power and judgment to pick and choose among its statutes and to allow attorneys' fees under some, but not others. But it would be difficult, indeed, for the courts, without legislative guidance, to consider some statutes important and others unimportant and to allow attorneys' fees only in connection with the former.
 
 
 19
 421 U.S. at 260-64, 95 S.Ct. at 1623-25 (emphasis added).
 
 
 20
 Defendant argues that great weight should be given to the opinion of the Comptroller General on which he relied before instituting this program. The opinion of the Comptroller General is, of course, entitled to weight as he is the auditing agent of Congress. However, when his opinion collides with that of the courts, the latter must govern. Greene County Planning Board, 559 F.2d 1227.
 
 
 21
 On the philosophy of plans for participant reimbursement, the words of Chief Judge Kaufman, in his concurring opinion in Greene County Planning Board, are instructive:
 
 
 22
 The decision whether to expend public funds to advance an essentially private point of view by its very nature is political and, in a democracy, more appropriately made by the elected representatives of the people. All interested individuals can claim, with utmost sincerity, to represent the "public". Some selection among potential intervenors becomes necessary, therefore, to assure a fair and balanced presentation of the various viewpoints while insuring, at the same time, that the agency does not exceed its financial constraints. Such choices are particularly unamenable to judicial structuring.
 
 
 23
 559 F.2d at 1240.
 
 
 24
 We hold that whether there shall be reimbursement for public participation in agency proceedings is a decision for the Congress and not the FDA or this Court.
 
 
 25
 The decision of the District Court is REVERSED.
 
 MURNAGHAN, Circuit Judge, dissenting:
 
 26
 As to standing, I am in full agreement with the majority. My dissent concerns the conclusion that the FDA lacks power to reimburse those whose participation in agency proceedings can reasonably be expected to contribute to a full and fair determination of the issue, but who, without reimbursement of their expenses, would be unable to participate effectively.
 
 
 27
 The authority of the FDA to hold hearings is clear. See, e. g., 21 U.S.C. §§ 344(b), 348(f), 355(c)-(e), 360b(d)-(e), 360e(g), 371(e). The authority to compel attendance to testify and otherwise to develop a record is also clear. 5 U.S.C. §§ 554, 556. The reason such powers exist is that, unless there is compilation by the FDA of an adequate record containing the relevant information, its judgments and actions implementing the powers conferred on it will be faulty. The resulting expense, not simply in monetary terms, to the public is obvious, and potentially enormous.
 
 
 28
 Consequently, I do not accept the argument that power to make the reimbursements authorized by the regulation is lacking simply by reason of the absence of explicit conferral of the authority in statutory language. Implicit grants of power are more common than explicit ones. Otherwise, the red tape issuing from Congress would be even more excessive than at present. The United States Code already occupies more than a five-foot shelf, and a requirement of explicit, detailed expression for every power would multiply the volumes several times over.
 
 
 29
 Indeed, the contention offends against customary concepts of communication. Rarely are explicators-we and Congress included-precise to the point of total, exhaustive, pinpoint clarity as to every detail falling within a stated concept. We usually express ourselves by way of examples or by generalizations, rather than by too exactly tailored categories. The attempt at excessive honing can wear away the ax. It is therefore not surprising that the courts have required only that a regulation be a "legitimate, reasonable, and direct adjunct to the (agency's) explicit statutory power...." Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 655, 98 S.Ct. 2053, 2067, 56 L.Ed.2d 591 (1978), quoting United States v. Chesapeake and Ohio Railway Co., 426 U.S. 500, 512, 96 S.Ct. 2318, 2324, 49 L.Ed.2d 14 (1976). See also, e. g., United States v. Bailey, 34 U.S. (9 Pet.) 238, 9 L.Ed. 113 (1835); Morrow v. Clayton, 326 F.2d 36 (10th Cir. 1963).
 
 
 30
 To my mind, the majority permits itself to be influenced too much by the consideration that persons with biases, with preconceived notions as to the desired outcome, are to be included among the resources tapped under the regulation. If we had for consideration whether "impartial" expert witnesses, or objective friend-of-the-court counsel, might be retained and reimbursed, I suspect that the majority's answer would have been different. Yet their approach ignores the pluralistic underpinnings of modern administrative law. Opposing expressions of competing and biased views, even if they are exaggerated or contradictory presentations of the facts, will often lead to a middle ground of truth and accuracy built on the existence of mutually modifying contrary contentions. They may, accordingly, equip an agency to determine which course of action is in the "public interest."[1]
 
 
 31
 The FDA regulation reflects the understandable and realistic concern that, if one side can afford to express its bias, while its opponent, holding a different, albeit equally salient, viewpoint, cannot, the resulting decision will be distorted, and less accurate than would have been the case if both were present.
 
 
 32
 Indeed, the concept of true impartiality is probably a myth. For most, if not all, of the areas into which the FDA must delve, a person with sufficiently sophisticated knowledge to be in a position to contribute valuable information has almost certainly acquired a bias in the course of obtaining the information.
 
 
 33
 It is, I submit, inapt to consider sources of payment for counsel fees in private litigation as a controlling analogy. In judicial proceedings between private individuals the American rule is that each side should bear its own expenses. Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). A court, however, has no further interest in the outcome than that it be fairly and expeditiously arrived at. The result qua result, customarily, is all that matters. A court considers only whether there shall be a judgment for one of the parties, and, if so, for how much. The FDA, on the other hand, conducts its inquiries in order that the substantive information developed may be employed for the public good. Sometimes none, sometimes all of the protagonists may be the winners.
 
 
 34
 Thus, in Alyeska, even though one of the parties was achieving a public benefit in its role as a private attorney general, nevertheless the body conducting the hearing, the court, had no assigned interest in programming litigation to that end. The result benefiting the public was incidental, insofar as the court was concerned. For the courts, the resolution of a specific controversy, rather than the development of public policy, is at issue. In this respect, the FDA, in its conduct of hearings, differs markedly, and to my mind decisively, insofar as the question here presented is concerned.
 
 
 35
 The majority has relied on three instances of explicit grants of power to agencies to allow compensation to participants in rulemaking or other proceedings: the Magnuson-Moss Warranty-Federal Trade Improvement Act, 15 U.S.C. § 57a(h)(1) (1976), the Toxic Substances Control Act, 15 U.S.C. § 2605(c)(4) (1976), and the Foreign Relations Authorization Act, 22 U.S.C. § 2692 (1976). It then, in effect, asserts, expressio unius est exclusio alterius. Yet that is a suspect manner of determining congressional intent. The maxim is to be applied with great caution and is recognized as unreliable. Bruce v. Lumbermens Mutual Casualty Co., 222 F.2d 642, 644-45 (4th Cir. 1955); National Petroleum Refiners Ass'n v. Federal Trade Commission, 482 F.2d 672, 676 (D.C.Cir.1973), cert. denied, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974); 2A Sutherland, Statutory Construction § 47.25 at 132.
 
 
 36
 Here we do not even have three items listed together to serve as a predicate for excluding a fourth. Instead they derive from three distinct statutory enactments, and, consequently, supply no substantial foundation for a deduction that the result for the FDA should be different than that for the other three agencies. The obvious fact is that Congress sometimes makes explicit a power already existing implicitly, and, at other times, regards the necessity for the power as so self-evident, so entwined in the nature of the agency and its functions, that it dispenses with the superfluous task of explicitly spelling out the power.
 
 
 37
 Nor do I find persuasive the non-adoption by Congress on several occasions of "the general authorization for all agencies to do so." Maj. op. at p. 1225. The federal agencies, taken as a whole, are diverse in purpose, and many in number. The mandate of the FDA to protect the public health is not shared by all agencies. Ascertainment of the powers of and limitations on each agency should be determined on the basis of its own legislation and circumstances. Indeed, it may be for that very reason that Congress has rejected broadly generalized proposed statutes designed to create a power applicable to all federal agencies.
 
 
 38
 A power such as the one under consideration here so manifestly aids the FDA in accomplishing its statutory mission that its implication is inescapable. The same may not be said of other agencies generally, less exposed to matters of health and to scientific complexities. The scientific nature and overweening importance of the subject matter with which the FDA deals leave no doubt that it may often benefit from outside assistance.
 
 
 39
 While placing great reliance on congressional actions of little relevance, the majority gives little weight to congressional action of considerable pertinence. On two occasions Congress made clear in appropriations measures its understanding that it was providing funds to meet expenditures of the very nature here involved. That constituted a clear recognition that the implied power to make such an expenditure existed in the FDA, for, Congress should not lightly be assumed to be participating in a breach of its own enactments. See Fleming v. Mohawk Wrecking & Lumber Co., 331 U.S. 111, 116, 67 S.Ct. 1129, 1132, 91 L.Ed. 1375 (1941); Brooks v. Dewar, 313 U.S. 354, 360-61, 61 S.Ct. 979, 981-82, 85 L.Ed. 1399 (1941).
 
 
 40
 Finally, the majority has placed reliance on the decision in Greene County Planning Board v. Federal Power Commission, 559 F.2d 1227 (2d Cir. 1976) (en banc ), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). The case is inapposite for the following reasons:
 
 
 41
 1. In Greene reimbursement was sought by all intervenors, irrespective of their economic capacities to meet their own expenses. Indeed, one of them was a New York county which was unlikely to be too impecunious to pay its own way. The proposed FDA regulation envisages reimbursement only for those having something to contribute to an enlightened solution, but insufficient resources to participate effectively without FDA reimbursement.
 
 
 42
 2. In Greene the claims for attorneys' fees emanated from all intervenors, regardless of whether their participation was deemed by the agency necessary to insure a rounded presentation and accurately determine the public interest. In the case of the proposed FDA regulation, to the contrary, the fee allowances would be restricted to parties encouraged in advance by the agency to participate, on the grounds that they would have worthwhile information to present,[2] but not economic wherewithal to do so on their own.
 
 
 43
 3. The fees sought in Greene were based on the expenses actually incurred by each intervening party, without regard to a preexisting limiting schedule. Under the FDA proposed regulation, however, any selected participant would know in advance that reimbursement would be restricted to the rate paid by the FDA to its expert witnesses, attorneys, consultants, or other employees performing similar services.
 
 
 44
 4. Alyeska, relied on in Greene, clearly concerned a different situation than the one presented by the proposed FDA regulation. Alyeska rejected a request for an order that one litigant pay the expenses of another litigant who had prevailed. The proposed regulation does not impose the burden of any fee reimbursement which may be allowed upon another participant in the hearing. Instead it calls for the United States itself to pay for the valuable services performed in furtherance of the public interest.[3]
 
 
 45
 5. Most important, the FPC in Greene elected not to pay attorneys' fees and other litigation expenses of intervenors in a hearing over the construction authorization for an electrical transmission line. The agency based its decision on a belief that it lacked authority, but also, alternatively, on its discretionary determination that "none of the intervenors deserved such compensation in any event since they had only been 'protecting their own interests.' " 559 F.2d at 1234.[4] There is a difference of some magnitude between a court's non-interference with an agency's decision declining to pay attorneys' fees, and a court's interference with an agency's decision to pay attorneys' fees. In both cases, deference to the agency in an area of its expertise should dictate non-interference.
 
 
 46
 Although the en banc majority in Greene expressed its decision in terms of lack of a legislative grant of authority, in fact, that was neither necessary to the result nor, I submit, the actual rationale of the case. Even had the FCC been explicitly authorized to reimburse participants in its proceedings, the agency would have decided, as a discretionary matter, against an award of attorneys' fees, and the court would have deferred to that exercise of discretion.
 
 
 47
 The crux of the Greene case is to be found at 559 F.2d at 1239, n.2:
 
 
 48
 The Federal Power Commission has never deemed itself authorized to pay the legal fees of private litigants and has sought no commitment from the Comptroller General as to the validity of such payments. This interpretation of the Federal Power Act by the agency charged with its administration is entitled to great deference from this Court.
 
 
 49
 That, purely and simply, is a statement that the court should be slow to force the agency to do something it does not want to do. By the same token, our court should be very slow to force the agency not to do something it does want to do, which is necessary to the effective exercise of its statutory authority.
 
 
 50
 For all those reasons, and for those expressed so cogently in the opinion of the district court, Pacific Legal Foundation v. Goyan, 500 F.Supp. 770 (D.Md.1980), I would affirm.
 
 
 
 *
 United States District Court for the Eastern District of North Carolina, sitting by designation
 
 
 [1]
 21 C.F.R. 10.200 (1980)
 
 
 [2]
 41 Fed.Reg. 35855 (1976)
 
 
 [3]
 44 Fed.Reg. 59174 (1979)
 
 
 [4]
 That opinion advised the FDA that it could properly reimburse participants "... where (it) determines that such participants 'can reasonably be expected to contribute substantially to a fair determination of' issues before it" and "only where persons or groups lack financial resources to participate adequately." Matter of Costs of Intervention-Food and Drug Administration, File B-139703 (Dec. 3, 1976)
 
 
 [5]
 44 Fed.Reg. 23044 (1979)
 
 
 [6]
 21 C.F.R. 10.220 (1980)
 
 
 [7]
 21 C.F.R. 10.220(c)(3)(i)-(iv) (1980)
 
 
 [8]
 21 C.F.R. 10.250(b) (1980)
 
 
 [9]
 "No officer or employee of the United States shall make or authorize an expenditure from or create or authorize an obligation under any appropriation or fund in excess of the amount available therein; nor shall any such officer or employee involve the Government in any contract or other obligation, for the payment of money for any purpose, in advance of appropriations made for such purpose, unless such contract or obligation is authorized by law."
 
 
 [10]
 "Except as otherwise provided by law, sums appropriated for the various branches of expenditure in the public service shall be applied solely to the objects for which they are respectively made, and for no others."
 
 
 [11]
 There are certain well-defined exceptions. See, Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 257, 95 S.Ct. 1612, 1621, 44 L.Ed.2d 141 (1975)
 
 
 [12]
 The following bills were, at least in part, designed to accomplish such results:
 S. 1080, 97th Cong., 1st Sess., §§ 2 et seq. (1981).
 S. 405, 97th Cong., 1st Sess. (1981).
 Regulation Reform Act of 1979: Hearings on H.R. 3263 Before the Subcommittee on Administrative Law and Governmental Relations of the Committee on the Judiciary, 96th Cong., 1st & 2d Sess. 1461 (1979-1980).
 Public Participation in Agency Proceedings: Hearings Before the Subcommittee on Administrative Law and Governmental Relations of the Committee on the Judiciary, 95th Cong., 1st Sess. 12 (1977).
 Public Participation in Federal Agency Proceedings Act of 1977: Hearings Before the Subcommittee on Administrative Practice and Procedure of the Committee on the Judiciary, 95th Cong., 1st Sess. Part 2, 73 (1977).
 Public Participation in Federal Agency Proceedings: Hearings Before the Subcommittee on Administrative Practice and Procedure of the Committee on the Judiciary, 94th Cong., 2d Sess. 137 (1976).
 13 U.S.Const., Art. IV, § 3, Cl. 2.
 
 
 [14]
 Cited by the Supreme Court was House Rule XXI(2) and Standing Rules of the Senate, Rule 16.4
 
 
 [1]
 See, e. g., Air Line Pilots Ass'n Int'l v. Civil Aeronautics Bd., 475 F.2d 900, 905 (D.C.Cir.1973); Palisades Citizens Ass'n v. Civil Aeronautics Bd., 420 F.2d 188, 192 (D.C.Cir.1969). See generally Gelhorn, Public Participation in Administrative Proceedings, 81 Yale L.J. 359, 360 (1972); Stewart, The Reformation of American Administrative Law, 88 Harv.L.Rev. 1669, 1683-85, 1711-13 (1975)
 
 
 [2]
 In the regulatory language, to secure reimbursement an applicant would have to demonstrate "a significant interest that is not adequately represented by another participant." 44 Fed.Reg. 23050 (1979)
 
 
 [3]
 Congress recently recognized the distinction in a different context. In the Equal Access to Justice Act, Pub.L.No. 96-481 (1981), Congress provided for reimbursement of attorneys' fees and other expenses in certain administrative adjudications. The statute states at § 202(b):
 The Congress further finds that because of the greater resources and expertise of the United States the standard for an award of fees against the United States should be different from the standard governing an award against a private litigant, in certain situations.
 
 
 [4]
 See also id. at 1238:
 These intervenors are protecting their own interests, and we see no reason to grant them fees and expenses. If they were generally allowed, a large financial burden would be imposed on this Commission and the taxpayer or upon the utility involved and inevitably on its rate payers.
 (Van Graafeiland, J., concurring).