**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellee,**

v.

**CBS, INC., Defendant-Appellant.**

**No. 1295, Docket 84–6063.**

United States Court of Appeals,
Second Circuit.

Argued May 17, 1984.
Decided Aug. 28, 1984.

---

**4.** In any case, defendants have consented to suit in state court. *See* 568 F.Supp. at 578.

George A. Stohner, Washington, D.C. (James Skelly Wright, Jr., Donna S. Mangold, Morgan, Lewis & Bockius, Washington, D.C., of counsel), for defendant-appellant.

Mark S. Flynn, Atty., E.E.O.C., Washington, D.C. (Richard K. Willard, Acting Asst. Atty. Gen. Carolyn Kuhl, Deputy Asst. Atty. Gen., Douglas Letter, Atty., Dept. of Justice, Washington, D.C., David L. Slate, Gen. Counsel, Philip B. Sklover, Associate Gen. Counsel, Susan Buckingham Reilly, Acting Asst. Gen. Counsel, E.E.O.C., Washington, D.C., of counsel) for plaintiff-appellee.

John R. Crenshaw, Atlanta, Ga. (Anne S. Rampacek, Alston & Bird, Atlanta, Ga., of counsel), for amicus curiae Chrysler Corp.

Joseph M. Wells, Lombard, Ill. (Marjorie Nemzura, Lombard, Ill., of counsel), for amicus curiae Natural Gas Pipeline Co. of America.

Rodger A. Kershner, Detroit, Mich., for amicus curiae ANR Pipeline Co.

Herschel L. Abbott, Jr., New Orleans, La. (H. Mark Adams, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., of counsel), for amicus curiae ANR Pipeline Co. and Natural Gas Pipeline Co. of America.

Before CARDAMONE, PRATT, and DANIEL M. FRIEDMAN of the United States Court of Appeals for the Federal Circuit, sitting by designation, Circuit Judges.

GEORGE C. PRATT, Circuit Judge.

This appeal presents a narrow but important question of first impression in this circuit:

Does the presence of a one-house veto clause in the Reorganization Act of 1977 invalidate the authority of the Equal Employment Opportunity Commission (EEOC), transferred to it by Reorganization Plan No. 1 of 1978, to enforce the Age Discrimination in Employment Act (ADEA)?

Judge Sprizzo below held that, although the legislative veto clause in question is unconstitutional in light of the Supreme Court's decision in *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), the EEOC retains authority to enforce the ADEA, 29 U.S.C. § 621 *et seq.*, because (1) the veto clause is severable from the rest of the Reorganization Act and, alternatively, (2) congress has ratified the transfer of enforcement authority to the EEOC. Because we conclude that the unconstitutional veto provision is not severable from the rest of the Reorganization Act, and that congress has not ratified the transfer of authority, we reverse the judgment of the district court and hold that, as of the effective date of our judgment on this appeal, absent corrective action by congress, the EEOC's authority to prosecute this action will cease.

## BACKGROUND

The Reorganization Act of 1977, Pub.L. No. 95–17, 91 Stat. 29, codified at 5 U.S.C. § 901 *et seq.* (the Act), conferred on the President authority to reorganize executive departments and agencies subject to a "veto" by either house of congress. Procedurally, the Act required the President to transmit any proposed reorganization plan to both houses, and such a plan was to become effective if neither house passed a resolution of disapproval within 60 days. 5 U.S.C. §§ 903, 906(a).

As authorized by the Act, President Carter prepared and submitted to congress Reorganization Plan No. 1 of 1978, 43 Fed. Reg. 19807, 92 Stat. 3871, *reprinted in* 1978 U.S.Code Cong. & Ad.News 9795–9800 (the Plan), which was designed to reorganize and expand the functions of the EEOC. Among the functions and responsibilities transferred to the EEOC were enforcement and administrative authority for the ADEA, which had previously been enforced by the Secretary of Labor. Since neither house passed a resolution of disap-

proval, the entire Plan, including its transfer of enforcement authority over the ADEA, became effective. *See generally EEOC v. Allstate Insurance Co.,* —— U.S. ——, 104 S.Ct. 3499, 82 L.Ed.2d 810 (1984) (Burger, *Ch.J.,* dissenting from dismissal of appeal for lack of jurisdiction).

In May 1981 the EEOC filed the complaint in this action, charging CBS with violating the ADEA. Over two years later, in September 1983, CBS moved to dismiss, claiming that the EEOC lacks power to enforce the ADEA, because the Plan's transfer of ADEA enforcement authority from the Department of Labor to the EEOC was subject to a one-house veto, a legislative device that was held unconstitutional in *Chadha.* The district court denied CBS's motion, but on its certification pursuant to 28 U.S.C. § 1292(b) we permitted this interlocutory appeal.

## DISCUSSION

In one broad stroke, the Supreme Court in *Chadha* invalidated every use of the legislative veto. 103 S.Ct. at 2788 (Powell, J., concurring); *see also id.* at 2792, 2810–11 (White, J., dissenting). Chief Justice Burger's majority opinion reasoned that this device, various forms of which had been inserted in nearly 200 federal laws since the mid-1930's, violated constitutional mandates of separation of powers, bicameralism, and presentment. *Id.* at 2781–88. In effect, the Court held that the convenience, flexibility, and efficiency of the device could not overcome the fact that it is clearly inconsistent with our constitutional structure. *Id.* at 2781.

Given such a strongly worded position by the Supreme Court, it is not surprising that the EEOC does not dispute that the legislative veto provision contained in the Reorganization Act is unconstitutional.

Instead, the EEOC argues that notwithstanding the unconstitutionality of the legislative veto device, it retains enforcement authority under the Plan, because (a) the veto provision is severable from the rest of the Act; (b) even if it is not severable, congress has ratified the Plan by its subsequent appropriation of funds for ADEA enforcement to the EEOC and by a reference to the Plan in § 905 of the Civil Service Reform Act of 1978, Pub.L. No. 95–454, 92 Stat. 1111, 1224, codified at 5 U.S.C. § 1101 (note); and (c) even if the provision is not severable and has not been ratified, our ruling should not be applied retroactively to invalidate a government reorganization that was implemented nearly five years ago.

We disagree with the EEOC on its first two arguments, severability and ratification, but will stay our judgment for a reasonable time in order to give congress an opportunity to cure the legislative defect.

## A. SEVERABILITY

■ Whether or not we should sever an unconstitutional provision from the remainder of the statute in which it appears is primarily an issue of legislative intent. "Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Buckley v. Valeo,* 424 U.S. 1, 108–09, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976) (quoting *Champlin Refining Co. v. Corporation Commission,* 286 U.S. 210, 234, 52 S.Ct. 559, 564, 76 L.Ed. 1062 (1932)); *accord Regan v. Time, Inc.,* —— U.S. ——, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984). Thus, we must decide whether congress would have delegated to the President the broad reorganizing authority granted him by the Act without reserving for itself the one-house veto power contained in 5 U.S.C. § 906(a). For guidance we look to the statute and its relevant legislative history.

■ To begin with we note that to hold the veto provision to be severable would confer upon the statute "a positive operation beyond the legislative intent * * * ", *Spraigue v. Thompson,* 118 U.S. 90, 95, 6 S.Ct. 988, 990, 30 L.Ed. 115 (1886), because the President alone then would have been permitted to reorganize the executive branch without any congressional control

over the process, short of formal legislation, and this would have been contrary to congress's intent as expressed in the Act, in the debates on the Act, and in the committee reports that preceded its enactment.

The Act was a compromise between two bills. One, H.R. 3407, sponsored by the administration, allowed either house to veto a reorganization plan with a resolution of disapproval introduced and processed through that house's normal parliamentary procedures. The other, H.R. 3131, drafted by Rep. Brooks, chairman of the House Committee on Government Operations, contained no legislative veto clause, but instead proposed to follow the usual legislative process of requiring approval for each reorganization plan by both houses and then presentment to the President for signature. H.R.Rep. No. 105, 95th Cong., 1st Sess. 3–4, 9, *reprinted in* 1977 U.S.Code Cong. & Ad.News 41, 43, 49 (House Report); *see also id.* at 36, *reprinted in* 1977 U.S.Code Cong. & Ad.News 63 (additional views of Rep. Brooks).

The compromise was H.R. 5045. Under it, formal legislative procedures for reorganization plans were set aside in favor of a special, expedited procedure for processing disapproval resolutions. Those resolutions had to be introduced in both houses immediately after submission of a proposed reorganization plan, and then referred to the Committee on Governmental Affairs of the Senate and the Committee on Government Operations of the House. 5 U.S.C. § 910. After 45 days, the resolutions automatically went onto the appropriate calendars of the house and senate even if they were not reported out by either committee. § 910(b). At this point, any member of congress could move for consideration of the disapproval resolution, and a majority "yes" vote in either house would veto the plan. § 912. This expedited mechanism for processing a disapproval resolution was designed to strengthen the role of congress in the reorganization process and to allay doubts that the Act would delegate too much legislative authority to the President. House Report at 3, 17, *reprinted in* 1977 U.S.Code Cong. & Ad.News 43, 56–57.

Many still questioned whether H.R. 5045 went far enough. They contended that the entire one-house veto mechanism was of questionable constitutionality and that even though the compromise bill permitted active congressional intervention in the reorganization process, it still violated the requirements of article I of the constitution. House Report at 9–17, *reprinted in* 1977 U.S.Code Cong. & Ad.News 49–57; *see also id.* at 36, *reprinted in* 1977 U.S.Code Cong. & Ad.News 63 (additional views of Rep. Brooks). Professor Philip Kurland of the University of Chicago Law School testified before the house subcommittee:

The question that I have been asked to address is whether Congress can authorize the President to write legislation which shall have the effect of law unless a majority of either House of Congress votes against accepting it as law.

*The plain and simple answer is that the Constitution does not provide for such a lawmaking procedure. It specifies a different process for the writing of laws.* It is for Congress, the legislative branch, to write the laws. A President is authorized to veto laws enacted by Congress and Congress is enpowered [sic] to override any such Presidential veto by a two-thirds majority of each House. The proposed executive reorganization bill would stand the Constitution on its head by putting the lawmaking power in the President and the veto power in Congress. *I know of no way constitutionally to justify such a process.*

House Report at 13–14, *reprinted in* 1977 U.S.Code Cong. & Ad.News 53 (emphasis added). Professor Laurence Tribe of Harvard Law School similarly thought the legislative veto procedure was unconstitutional. *Id.* at 15, *reprinted in* 1977 U.S.Code Cong. & Ad.News 54–55.

Even more telling were the pointed additional remarks of Rep. Drinan, who, in objecting to the one-house veto provision on constitutional grounds, emphasized that, if the veto provision was found to be un-

constitutional, the whole act would necessarily be found unconstitutional:

> Why is it not possible or practical or wise to undertake reorganization through the normal legislative process? Why is it necessary to take all these constitutional short-cuts when the regular procedures are in place and available? And why would the administration want to risk that the courts might hold the act unconstitutional and thus upset administrative action taken pursuant to reorganization plans? *It must be remembered that H.R. 5045 intentionally does not contain a severability clause. The one House veto provision is deemed to be an integral and necessary part of the legislative scheme for reorganization. That is a proposition to which all agree.* Yet that unanimous concurrence jeopardizes the plans developed under the statute, and all agency authority exercised pursuant to them.

*Id.* at 42, *reprinted in* 1977 U.S.Code Cong. & Ad.News 69 (emphasis added); *see also* Rep. Drinan's comment at 123 Cong. Rec. 9352 (1977) ("In the absence of a severability clause [congress recognizes] that if the one House veto clause fails, the whole act fails").

In spite of these constitutional warnings, the House Committee on Government Operations recommended the bill because in its judgment "the risk [was] worth taking." House Report at 3, *reprinted in* 1977 U.S. Code and Ad.News 42–43. Moreover, in the conclusion of its report to the house, the committee stated:

> The question remains unresolved, but it is the position of the committee that the risk of an unfavorable ruling by the courts, while still remaining, may have been lessened by the adoption of the new voting procedure and the added limitations on the use of the reorganization authority.

*Id.* at 17, *reprinted in* 1977 U.S.Code Cong. & Ad.News 57.

Rather than delete the veto provision or add a severability clause expressing its desire that the Act remain effective should the court invalidate the veto provision, congress followed the route recommended by the house committee. It did so in a well-intentioned effort to combine efficiency with ultimate congressional control. The veto provision insured substantial congressional oversight of the reorganization process while the Act's other provisions granted the President wide flexibility in designing the reorganizations by not requiring each plan to obtain full and formal congressional approval. *See* 123 Cong.Rec. 9344 (1977) (remarks of Rep. Brooks); 123 Cong.Rec. 6145 (1977) (remarks of Sen. Ribicoff). Because it served both of these objectives so well, the one-house veto was viewed as "the key provision" of the bill, House Report at 17, *reprinted in* 1977 U.S.Code Cong. & Ad.News 57, and "an integral and necessary part of the legislative scheme for reorganization". *Id.* at 42, *reprinted in* 1977 U.S.Code Cong. & Ad.News 69 (additional views of Rep. Drinan).

It follows that, without such a provision, congress would have been unwilling to delegate to the President such extensive authority to reorganize the executive branch. We therefore conclude that the unconstitutional veto provision is not severable and that the entire Reorganization Act is unconstitutional.

We are aware that in so holding we depart from the fifth circuit, which, in *EEOC v. Hernando Bank, Inc.*, 724 F.2d 1188, 1190–92 (5th Cir.1984), held this legislative veto provision to be severable. We disagree with their view for three reasons. First, the fifth circuit concluded that, with the exception of Rep. Drinan's comments, there was nothing in the language of the Act or its legislative history to indicate that congress would not have enacted this statute in the absence of the unconstitutional provision. *Id.* at 1191. We think that, in light of the rest of the legislative history discussed above, and particularly, the house report, this conclusion is clearly incorrect. Moreover, as indicated above, the consequences of excising the veto provision, the comments on the floor of congress, and the materials contained in the

committee reports all demonstrate that the veto provision was a "key provision" and an "integral and necessary" part of the Act. We conclude that, without it, the Act would not have been enacted.

Second, the fifth circuit noted that congress did not consider the issue of severability. But whether or not it did so is beside the point, for the more appropriate inquiry is whether the veto provision is such an integral part of the law as to compel the conclusion that congress would not have passed the Act without that unlawful provision. *See Buckley v. Valeo*, 424 U.S. at 108–09, 96 S.Ct. at 677.

Finally, in further support of its conclusion of severability, the fifth circuit referred to the limitations imposed by the Act on the executive branch, the need for flexibility in the reorganization process, the cost-effectiveness of a one-house veto provision, and the ultimate authority retained by congress over the "substantive operation of the federal government". *EEOC v. Hernando Bank, Inc.*, 724 F.2d at 1192. While these factors may bear on the wisdom of the Act and even on the constitutionality of its legislative veto provision, they do not help much in determining whether congress was willing to turn the reorganization process over to the President unrestricted and unsupervised. It seems clear that congress did not wish to divorce itself from the reorganization process. Indeed, even the fifth circuit acknowledges that one of congress's objectives was to strengthen its own role in reorganizing the executive branch, *id.* at 1191–92, and this fact militates against severability, because it was the veto provision that was seen as essential to congress's control over the process.

## B. *RATIFICATION*

The EEOC next argues that even if the entire Act is unconstitutional, the transfer of enforcement authority effected by the Plan has since been ratified by congressional enactments that do satisfy the constitutional requirements of bicameralism and presentment, specifically a number of appropriations acts and § 905 of the Civil Service Reform Act of 1978.

■ Although congress may ratify otherwise unauthorized actions, *Isbrandtsen-Moller Co. v. United States*, 300 U.S. 139, 147–48, 57 S.Ct. 407, 411, 81 L.Ed. 562 (1937); *Swayne & Hoyt v. United States*, 300 U.S. 297, 301–02, 57 S.Ct. 478, 479–480, 81 L.Ed. 659 (1937), to do so its ratifying legislation must recognize that the actions involved were unauthorized when taken and must also expressly ratify those actions in clear and unequivocal language. *Id.; see also Silas Mason v. Tax Commission*, 302 U.S. 186, 208, 58 S.Ct. 233, 244, 82 L.Ed. 187 (1937); *EEOC v. Martin Industries, Inc.*, 581 F.Supp. 1029, 1034 (N.D. Ala.1984), *appeal filed*, 53 U.S.L.W. 3033 (U.S. May 18, 1984) (No. 83–1893). Mere "acquiescence or nonaction" is not enough for ratification, "because explicit action, especially in areas of doubtful constitutionality, requires careful and purposeful consideration by those responsible for enacting and implementing our laws." *Greene v. McElroy*, 360 U.S. 474, 507, 79 S.Ct. 1400, 1419, 3 L.Ed.2d 1377 (1959). *Chadha's* strict interpretation of the principles of bicameralism, presentment, and separation of powers reinforces the need for strong evidence of ratification.

■ References to the ADEA in relation to the EEOC that are buried in lengthy and comprehensive appropriations acts, *e.g.*, Pub.L. No. 98–166, 97 Stat. 1071, 1088 (1983); Pub.L. No. 97–377, 96 Stat. 1830, 1874 (1982); Pub.L. No. 97–92, 95 Stat. 1183, 1192 (1981), do not suffice under these principles to ratify a specific transfer of enforcement authority from the Secretary of Labor to the EEOC. Appropriation acts "have the limited and specific purpose of providing funds for authorized programs", *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 190, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978). Legislators are not required to check the background of each authorization before voting on an appropriations measure; they are instead entitled to assume that the underlying substantive programs are valid. *Id.* Since the sub-

stantive aspects of appropriations bills are subject to much less scrutiny than the substantive programs themselves, *see Pacific Legal Foundation v. Goyan,* 664 F.2d 1221, 1226 (4th Cir.1981); *see also Andrus v. Sierra Club,* 442 U.S. 347, 355–65, 99 S.Ct. 2335, 2339–44, 60 L.Ed.2d 943 (1979), an appropriations bill is a particularly unsuitable vehicle for an implied ratification of unauthorized actions funded therein. *Cf. Fleming v. Mohawk Wrecking and Lumber Co.,* 331 U.S. 111, 116, 67 S.Ct. 1129, 1132, 91 L.Ed. 1375 (1947). This is especially true where, as here, the unauthorized action is an unconstitutional one, rather than merely a technically improper one. *See EEOC v. Martin Industries, Inc.,* 581 F.Supp. at 1035–36.

A reference to the Plan in § 905 of the Civil Service Reform Act of 1978, Pub.L. No. 95–454, 92 Stat. 1111, 1224, codified at 5 U.S.C. § 1101 (note), is equally insufficient to ratify the President's transfer of ADEA enforcement authority to the EEOC. That act was 117 pages long and was designed to effect a comprehensive reform of the federal civil service system. On page 114, under "miscellaneous", is a provision that states "[a]ny provision in either Reorganization Plan Numbered 1 or 2 inconsistent with any provision in this Act is hereby superseded." 92 Stat. 1224. If anything, this reference to the Plan tends to invalidate, rather than ratify it. There is no reference here to the specific transfer of enforcement authority at issue, nor is this the type of "deliberate" action by congress that would operate to ratify the otherwise unauthorized transfer. *Cf. Silas Mason v. Tax Commission,* 302 U.S. at 208, 58 S.Ct. at 244.

For the foregoing reasons, we hold that the Act is unconstitutional in its entirety and that the Plan promulgated thereunder is unconstitutional as well. As a result, the EEOC lacks authority to enforce the ADEA.

## C. *RETROACTIVITY*

The EEOC's final argument is that even if the Act is invalid in its entirety and was not thereafter ratified by congress, we should not apply our ruling of unconstitutionality retroactively. The EEOC argues that our decision should be given only prospective effect in order to "avoid the major disruption which can result from invalidating past government actions and in order to avoid undue, inequitable burdens on individuals". Brief for Appellee at 37. We are told that there are currently pending 111 cases brought by the EEOC to enforce the ADEA as well as 69 cases under the Equal Pay Act, whose enforcement responsibility was also transferred from the Labor Department to the EEOC under the Plan. *Id.* at 43. The EEOC argues that dismissal of those suits on the ground that the Plan was invalid could cause severe prejudice to the many innocent victims of discrimination who have relied upon the EEOC's litigation efforts. The EEOC further contends that because the President's authority to promulgate plans under the Act has now expired, and because the Plan has already been implemented, the transfer of enforcement authority is already an accomplished fact and the EEOC should be permitted to continue enforcing the ADEA notwithstanding the unconstitutional genesis of its authority.

To the extent that the EEOC asks us to determine the impact of our present decision on cases that are not now, and may never be, before us, we think the request is, at best, premature. We express no opinion as to the impact of this decision on any other ADEA claim, administrative or judicial.

To the extent that the EEOC asks us to ignore in this case, the unconstitutional basis for its authority to enforce the ADEA against CBS, we reject the request. We recognize, however, that immediate, automatic dismissal of the complaint would be an unnecessarily drastic remedy. We think it more appropriate to stay the judgment on this appeal until December 31, 1984, to afford congress an opportunity to take appropriate measures either to validate the EEOC's authority over ADEA enforcement, or to otherwise clarify its requirements for enforcing that statute. *See Northern Pipeline Constr. Co. v. Mara-*

*thon Pipe Line Co.*, 458 U.S. 50, 87–89, 102 S.Ct. 2858, 2879–80, 73 L.Ed.2d 598 (1982). We do this so as not to impair the processing and prosecution of ADEA claims unnecessarily, and to better protect the rights of individuals who have such claims. We are encouraged by the fact that the house of representatives has already passed a bill designed to remedy the unconstitutional defects of plans promulgated under the Act, H.R. 1314, 98th Cong., 2d Sess., 130 Cong. Rec. H2519–21 (daily ed. April 10, 1984), and we hope that congress and the President will expeditiously enact that or similar legislation, following the requirements of article I of the constitution, so as to avoid unnecessary disruption in the prosecution of pending and future age discrimination claims.

### CONCLUSION

The order of the district court is reversed and the action is remanded to the district court with a direction to dismiss the complaint. The judgment to be entered on this appeal shall be stayed until December 31, 1984. If prior to that date congress shall pass legislation affecting the authority of the plaintiff to maintain this action, the district court shall then conduct such further proceedings as may be appropriate.